## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DEREK ROTONDO, on behalf of himself and
all others similarly situated,

                   Plaintiff,

     v.

JPMORGAN CHASE Bank, N.A.,

                  Defendant.

No. 1:19-cv-408

District Judge: Michael R. Barrett
Magistrate Judge:

## PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS, APPOINTMENT OF PLAINTIFF'S COUNSEL AS CLASS COUNSEL, AND APPROVAL OF THE PROPOSED NOTICE OF SETTLEMENT AND CLASS ACTION SETTLEMENT PROCEDURE, AND MEMORANDUM IN SUPPORT

Plaintiff respectfully submits the following Unopposed Motion for Preliminary Approval of Class Action Settlement, Conditional Certification of the Settlement Class, Appointment of Plaintiff's Counsel as Class Counsel, and Approval of the Proposed Notice of Settlement and Class Action Settlement Procedure ("Motion"), and Memorandum in Support. For the reasons set forth below, in the accompanying declarations and the exhibits attached hereto, and in all pleadings and documents on file in this action, Plaintiff respectfully requests that the Court enter an Order:

(1)     granting preliminary approval of the $5,000,000.00 settlement memorialized in the Joint Stipulation of Settlement Agreement and Release;

(2) conditionally certifying the Settlement Class defined in the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e);

(3) appointing Outten & Golden LLP and the American Civil Liberties Union Women's Rights Project Class Counsel; and

(4) approving the form and manner of distributing the proposed Notice and Claim Form

## MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 2

    A.    Plaintiff Derek Rotondo ............................................................................ 2

    B.    The Events Giving Rise to the EEOC Charge ....................................... 2

    C.    Mr. Rotondo's Charge ............................................................................. 3

    D.    Settlement Negotiations and the Change in Chase's Policy .................. 3

    E.    The Legal Claims Underlying the EEOC Charge and This Class Action Lawsuit  4

III.    SUMMARY OF THE SETTLEMENT TERMS ................................................................. 8

    A.    The Settlement Class................................................................................. 8

    B.    Programmatic Relief ................................................................................. 9

    C.    The Settlement Fund ................................................................................. 9

    D.    The Notice and Claims Process for Class Members to Receive Compensation... 10

    E.    Releases................................................................................................... 11

    F.    Payments to Settlement Class Members from the Net Settlement Fund .............. 11

    G.    Attorneys' Fees, Litigation Expenses, and Service Payment .............................. 12

    H.    Settlement Claims Administrator........................................................... 12

IV.    CLASS ACTION SETTLEMENT PROCEDURE ........................................................... 13

V.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE ............... 13

    A.    Plaintiff Has a Strong Case, as to Both Liability and Damages. .......................... 14

    B.    Plaintiff and Class Members Would Face Real Risks in Further Litigation......... 16

    C.    Further Litigation Would Be Lengthy, Complex, and Costly. ............................. 18

    D.    Maintaining the Class Through Trial Would Not Be Simple. .............................. 19

E.      The $5 Million Settlement Fund Is Substantial. ..................................................... 19

F.      Discovery Advanced Enough for the Parties to Resolve the Case Responsibly... 20

G.      Experienced Counsel Recommend Approval. ........................................................ 21

H.      The Reaction of the Class Has Been Positive. ...................................................... 22

I.      Approval Is in the Public Interest. ........................................................................ 23

J.      Defendant's Ability to Withstand a Judgment Is Neutral. ..................................... 23

VI.    PROVISIONAL CERTIFICATION OF A CLASS IS APPROPRIATE......................... 23

A.      Numerosity............................................................................................................ 24

B.      Commonality......................................................................................................... 25

C.      Typicality .............................................................................................................. 26

D.      Adequacy of the Named Plaintiff ......................................................................... 26

E.      Certification Is Proper under Rule 23(b)(3)........................................................ 27

       1.      Common Questions Predominate........................................................... 27

       2.      A Class Action Is Superior to Individual Actions. ................................ 28

VII.   PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL. ......... 29

VIII.  THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE APPROPRIATE.......... 29

IX.    CONCLUSION.............................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................. 27, 28

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996) .................................................................................. 26

*Aro Corp. v. Allied Witan Co.*,
   531 F.2d 1368 (6th Cir. 1976) ................................................................................ 13

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................................. 18, 23

*Bert v. AK Steel Corp.*,
   No. 02 Civ. 467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008) ............................. 21

*In re Broadwing, Inc. ERISA Litig.*,
   252 F.R.D. 369 (S.D. Ohio 2006) .......................................................................... 13

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
   479 U.S. 272 (1987) ......................................................................................... 5, 6, 15

*Chavkin v. Santaella*,
   81 A.D.2d 153 (N.Y. App. Div. 1981) .................................................................. 6, 7

*Chen–Oster v. Goldman, Sachs & Co.*,
   325 F.R.D. 55 (S.D.N.Y. 2018) ............................................................................. 19

*Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*,
   803 F.2d 878 (6th Cir. 1986) ................................................................................. 23

*Daffin v. Ford Motor Co.*,
   458 F.3d 549 (6th Cir. 2006) ................................................................................. 24

*Davis v. Cintas Corp.*,
   717 F.3d 476 (6th Cir. 2013) ................................................................................. 19

*Ehrheart v. Verizon Wireless*,
   609 F.3d 590 (3d Cir. 2010) .................................................................................. 23

*Ford Motor Co. v. Mustangs Unlimited, Inc.*,
   487 F.3d 465 (6th Cir. 2007) ................................................................................. 23

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ............................................................................ 24

*Granada Invs., Inc. v. DWG Corp.*,
   962 F.2d 1203 (6th Cir. 1992) ...................................................................... 16

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ........................................................................................ 5

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
   204 F.R.D. 330 (N.D. Ohio 2001) ................................................... 14, 26, 29

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) ................................................................. 13, 24

*Johnson v. Univ. of Iowa*,
   431 F.3d 325 (8th Cir. 2005) ........................................................................ 15

*Knussman v. Maryland*,
   272 F.3d 625 (4th Cir. 2001) .................................................................... 6, 16

*Kucharski v. CORT Furniture Rental*,
   342 F. App'x 712 (2d Cir. 2009) .................................................................. 15

*L.A. Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ...................................................................................... 4

*Levell v. Monsanto Research Corp.*,
   191 F.R.D. 543 (S.D. Ohio 2000) ........................................................... 20, 21

*Martin v. Behr Dayton Thermal Prod. LLC*,
   896 F.3d 405 (6th Cir. 2018) ........................................................................ 28

*McDonald v. Franklin Cty.*,
   306 F.R.D. 548 (S.D. Ohio 2015) ................................................................. 26

*Myers v. Marietta Mem'l Hosp.*,
   No. 15 Civ. 2956, 2018 WL 4932087 (S.D. Ohio Sept. 10, 2018) ................. 25

*Nev. Dep't of Human Res. v. Hibbs*
   538 U.S. 721 (2003) ............................................................................ *passim*

*Newport News Shipbuilding Co. v. EEOC*,
   462 U.S. 669 (1983) .................................................................................. 4, 5

iv

*Oncale v. Sundowner Offshore Servs. Inc.*,
    523 U.S. 75 (1998) ........................................................................................................ 5, 15

*Phillips v. Philip Morris Cos. Inc.*,
    298 F.R.D. 355 (N.D. Ohio 2014) ......................................................................................... 24

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
    654 F.3d 618 (6th Cir. 2011) ............................................................................................... 28

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*,
    421 N.E.2d 128 (Ohio 1981) ................................................................................................... 4

*Potter v. Blue Cross Blue Shield of Mich.*,
    No. 10 Civ. 14981, 2013 WL 12182603 (E.D. Mich. Mar. 4, 2013) ....................................... 25

*Pund v. City of Bedford, Ohio*,
    339 F. Supp. 3d 701 (N.D. Ohio 2018) ................................................................................. 28

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ............................................................................................................. 16

*Robinson v. Shelby Cty. Bd. of Educ.*,
    566 F.3d 642 (6th Cir. 2009) ......................................................................................... 13, 23

*Schaefer v. Tannian*,
    No. 73 Civ. 39943, 1995 WL 871134 (E.D. Mich. Apr. 17, 1995) ......................................... 18

*Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh*,
    903 F.2d 243 (3d Cir. 1990) ............................................................................................... 6, 15

*Schell v. Frederick J. Hanna & Assocs., P.C.*,
    No. 15 Civ. 418, 2016 WL 1273297 (S.D. Ohio Mar. 31, 2016) ........................................... 24

*Senter v. Gen. Motors Corp.*,
    532 F.2d 511 (6th Cir. 1976) ............................................................................................... 26

*Smith v. Ajax Magnethermic Corp.*,
    No. 02 Civ. 0980, 2007 WL 3355080 (N.D. Ohio Nov. 7, 2007) ........................................... 24

*In re S. Ohio Corr. Facility*,
    173 F.R.D. 205 (S.D. Ohio 1997) ......................................................................................... 14

*Stanley v. Turner Oil & Gas Props., Inc.*,
    No. 16 Civ. 386, 2018 WL 2268138 (S.D. Ohio Mar. 6, 2018) ............................................. 14

*Sweet v. Gen. Tire & Rubber Co.*,
No. 75 Civ. 181A, 1982 WL 278 (N.D. Ohio Mar. 17, 1982)................................... 19

*In re Telectronics Pacing Sys., Inc.*,
137 F. Supp. 2d 985 (S.D. Ohio 2001) .................................................................. 18

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)........................................................................................... 27

*Vassalle v. Midland Funding, LLC*,
No. 11 Civ. 96, 2014 WL 5162380 (N.D. Ohio Oct. 14, 2014) ............................. 16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)................................................................................................ 25

*Watson v. City of Cleveland*,
202 F. App'x 844 (6th Cir. 2006) ............................................................................. 4

*In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*,
722 F.3d 838 (6th Cir. 2013) ............................................................................ 25, 28

*Wright v. Premier Courier, Inc.*,
No. 16 Civ. 420, 2018 WL 3966253 (S.D. Ohio Aug. 17, 2018)....................... 20, 21

**Statutes**

42 U.S.C. § 2000e-2.............................................................................................. 4, 16

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... *passim*

**Other Authorities**

1 William B. Rubenstein, *Newberg on Class Actions* (3d ed. 1992) ........................... 26

2 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2012)........................... 27

4 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2018)........................... 13

Manual for Complex Litigation (Third) (1995) ......................................................... 14

U.S. Equal Emp. Opportunity Commission, Notice No. 915.002, Enforcement Guidance:
Unlawful Disparate Treatment of Workers with Caregiving Responsibilities (2007) .............. 7

U.S. Equal Emp. Opportunity Commission, Notice No. 915.003, EEOC Enforcement Guidance
on Pregnancy Discrimination and Related Issues I.C.3 (2015) .................................. 7

## I.      <u>INTRODUCTION</u>

Plaintiff Derek Rotondo ("Named Plaintiff" or "Plaintiff"), for himself and the class of persons he seeks to represent, and Defendant JPMorgan Chase Bank, N.A. ("Defendant" or "Chase") (together with Plaintiff, the "Parties") have agreed to settle this putative class action in which Mr. Rotondo alleges that Chase discriminated against thousands of birth fathers in violation of federal and state law in its provision of paid parental leave.  The class settlement, which provides substantial monetary and programmatic relief, is fair, adequate, and reasonable, and was reached through informed, arm's-length negotiations facilitated by an experienced mediator.

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiff requests that the Court:  (1) grant preliminary approval of the Joint Stipulation of Settlement Agreement and Release ("Settlement"), attached as Exhibit 2 to the Declaration of Peter Romer-Friedman ("Romer-Friedman Decl.");[1] (2) conditionally certify the proposed class under Rule 23(b)(3) for settlement purposes; (3) appoint Outten & Golden LLP ("O&G") and the American Civil Liberties Union ("ACLU") as Class Counsel; and (4) approve the proposed Notice of Proposed Settlement of Class Action Lawsuit and Fairness Hearing ("Notice" or "Notices," attached as Exhibit D to the Settlement) and proposed Claim Form (attached as Exhibit A to the Settlement) and direct their distribution.  Defendant does not oppose the relief sought in this motion.

---

[1] Unless otherwise indicated, all exhibits are attached to the Romer-Friedman Declaration, and all capitalized terms have the definitions set forth in the Settlement.

II.    **FACTUAL AND PROCEDURAL BACKGROUND**

A.    **Plaintiff Derek Rotondo**

Plaintiff Derek Rotondo has worked for Chase since 2010.  Complaint ¶ 15, ECF No. 1 ("Compl.").  Currently, Mr. Rotondo is an Associate and Investigator in Global Security and Investigations, where he investigates fraud and abuse of vulnerable adults.  *See id.*  He is a veteran, having served in the U.S. Navy.  Romer-Friedman Decl. ¶ 24.  He and his wife have two children, who were born in May 2015 and June 2017.  Compl. ¶¶ 17, 25.

B.    **The Events Giving Rise to the EEOC Charge**

Several weeks before his second child was born, Mr. Rotondo inquired of Chase's Human Resources department whether he could qualify as the "primary caregiver" under Chase's paid parental leave policy.  *Id.* ¶ 21.  Under that policy, which took effect in 2016 (the "2016 Policy"), employees who were primary caregivers could receive up to 16 weeks of paid parental leave, while employees who were not primary caregivers (non-primary caregivers) could only receive up to 2 weeks of paid parental leave.  *Id.* ¶¶ 3, 22.[2]

Chase personnel informed Mr. Rotondo that birth mothers were presumptively treated as primary caregivers, while birth fathers were presumptively treated as non-primary caregivers. *Id.* ¶¶ 22-23.  Chase personnel informed Mr. Rotondo, by phone and in a written electronic message, that in order to qualify as primary caregivers, birth fathers would have to show (1) that the father's spouse had returned to work, or (2) that the spouse was medically incapable of caring for the child.  *Id.*  Although Mr. Rotondo intended to be the primary caregiver for his son, he could not satisfy those requirements at the time because his wife had not yet returned to work—

---

[2] The policy that preceded the 2016 policy provided 12 weeks of paid parental leave to primary caregivers and one week of paid parental leave to non-primary caregivers, but was otherwise substantially similar to the 2016 policy ("the pre-2016 Policy").  Compl. ¶¶ 3, 16.

as she was a teacher and not teaching at the time—and because she *was* capable of caring for their child. *Id.* ¶¶ 22-23, 26-27.

### C.    Mr. Rotondo's Charge

On June 15, 2017, Mr. Rotondo filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") challenging Chase's denial of his request for primary caregiver leave and Chase's alleged policy and practice of denying primary caregiver leave to fathers, on behalf of himself and a class of similarly situated male employees who had been denied primary caregiver leave by Chase.  Charge of Discrimination ¶¶ 3-4, attached as Exhibit 1 ("Charge").  His charge challenged both the pre-2016 and the 2016 Policies.  *Id.* ¶ 4. On November 8, 2018, the EEOC issued a determination, finding reasonable cause to believe that a violation of Title VII occurred, which Chase disputes.  Romer-Friedman Decl. ¶ 28.  On February 8, 2019, the EEOC issued a right to sue letter to Mr. Rotondo.  *Id.*; *see* Compl. ¶ 14.

### D.    Settlement Negotiations and the Change in Chase's Policy

Shortly after Mr. Rotondo filed his EEOC charge, the Parties agreed to attempt to resolve the putative class action without resorting to litigation.  Romer-Friedman Decl. ¶ 29.  From July 2017 to April 2019, the Parties engaged in settlement discussions and informal discovery to learn about Chase's policies and how putative class members were impacted by the policies.  *Id.* ¶ 30. On July 25 and October 3, 2017, the Parties met in person to begin exchanging information and negotiating settlement terms.  *Id.*  On April 16 and May 14, 2018, the Parties engaged in two days of mediation with an experienced employment mediator, Hunter Hughes.  *Id.* ¶ 34.  During the mediation process, the Parties exchanged detailed mediation statements on the claims, defenses, and potential damages.  *Id.* ¶ 33.

From May 2018 to April 2019, the Parties negotiated an agreement in principle; exchanged many Settlement drafts; developed a claims process, Claim Form, and proposed

Notice; and issued a request for proposal to settlement administrators to jointly recommend one to the Court. *Id.* ¶ 35. The Settlement was executed on May 28, 2019. *Id.* During this process, all negotiations were conducted on an arm's-length basis. *Id.* ¶ 16; Settlement § 5.1.

While the settlement talks were ongoing, Chase changed its parental-leave policy in December 2017 to remove gender-specific language and clarify that fathers are eligible to be designated as primary caregivers on the same basis as mothers. *See* Compl. ¶ 34.

### E. The Legal Claims Underlying the EEOC Charge and This Class Action Lawsuit

On May 30, 2019, Mr. Rotondo filed this putative class action alleging that Chase violated Title VII of the Civil Rights Act and state anti-discrimination laws by providing birth fathers different access to paid parental leave than that which was provided to birth mothers. *See* Compl. ¶ 5; Settlement § 2.4(A). Mr. Rotondo seeks to represent a nationwide class of male employees of Chase who used the non-primary caregiver leave available to them to care for their children and were deterred or denied primary caregiver leave. Compl. ¶ 36.

Under Title VII's prohibition on sex discrimination, an employer violates the statute when it "discriminate[s]" against individuals in "compensation, terms, conditions, or privileges of employment" on the basis of sex.[3] 42 U.S.C. § 2000e-2(a)(1); *see Newport News Shipbuilding Co. v. EEOC*, 462 U.S. 669, 684-85 (1983). A policy or practice intentionally discriminates based on sex when "evidence shows treatment of a person in a manner which but for that person's sex would be different." *L.A. Dep't of Water & Power v. Manhart*, 435 U.S.

---

[3] Courts in the Sixth Circuit, as in most other circuits, have recognized that Ohio state antidiscrimination law claims should be interpreted in line with Title VII. *See, e.g.*, *Watson v. City of Cleveland*, 202 F. App'x 844, 853 (6th Cir. 2006) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)).

4

702, 711 (1978). Consequently, men and women may be subject to sex discrimination. *See Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (Ginsburg, J., concurring))).

Fringe benefits, including any period of paid or unpaid parental leave, are among the terms, conditions or privileges of employment that must be offered on a non-discriminatory basis. *Newport News*, 462 U.S. at 683; *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 279 n.10 (1987). While employer policies may account for physiological differences related to pregnancy, a condition unique to women, they may not distinguish between male and female employees based on "stereotypical notions about pregnancy and the abilities of pregnant workers," *Guerra*, 479 U.S. at 290, or based on gender stereotypes related to women's presumed role as caregivers, *see id*.

For these reasons, the Supreme Court has held that while employers may allow employees who give birth time off under sick or temporary disability leave policies to physically recover from childbirth, a disparity in the period of leave given to female and male employees must be limited to "the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions." *Id*. By contrast, the Court has cautioned that statutes or policies that grant unequal caregiving leave between men and women are premised upon unlawful gender stereotypes that violate Title VII. *Id*. As Justice Rehnquist explained in *Nevada Department of Human Resources v. Hibbs*:

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. These mutually reinforcing

> stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees. Those perceptions, in turn, Congress reasoned, lead to subtle discrimination that may be difficult to detect on a case-by-case basis.

538 U.S. 721, 736 (2003). The Court pointed to state laws relating to family leave that provided *only* maternity leave as evidence of the "pervasive sex-role stereotype that caring for family members is women's work," and found that such stereotypes provided sufficient basis to abrogate state sovereign immunity under the Family and Medical Leave Act ("FMLA"). *Id.* at 731-32 & nn.5-6, 737.

Consistent with *Guerra* and *Hibbs*, courts have long held that any leave (paid or unpaid) that is provided for the purpose of bonding with or caring for a newborn that exceeds an amount necessary for a mother to recover from childbirth must be offered equally to men and women, and have invalidated policies that provide leave only to women in excess of that time. For example, in *Knussman v. Maryland*, 272 F.3d 625 (4th Cir. 2001), the Fourth Circuit held that Maryland's policy and practice of refusing to provide FMLA leave to fathers violated equal protection. *Id.* at 650 n.3. Noting that "gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court," the Fourth Circuit held the state had failed to articulate an important justification for the practice of denying caregiver leave to fathers. *Id.* at 636. Other courts have reached similar conclusions. *See, e.g.*, *Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh*, 903 F.2d 243, 248 (3d Cir. 1990) (invalidating a collective bargaining agreement provision that gave up to a year of unpaid maternity leave to women only, without regard to whether the employee suffered a pregnancy or childbirth-related disability); *Chavkin v. Santaella*, 81 A.D.2d 153, 157-58 (N.Y. App. Div. 1981) (finding practice

of permitting only female employees to use full amount of accrued sick leave after childbirth, regardless of any demonstrated physical disability, discriminated against male employees, even where both male and female employees had access to paid "infant care leave").

The same rule is found in the EEOC's guidance, which distinguishes between "leave related to any physical limitations imposed by pregnancy or childbirth . . . and leave for purposes of bonding with a child and/or providing care for a child."  U.S. Equal Emp. Opportunity Comm'n, No. 915.003, EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues I.C.3 (2015), http://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm#IC3.  The EEOC explains that "parental leave must be provided to similarly situated men and women on the same terms," such that if "an employer extends leave to new mothers beyond the period of recuperation from childbirth . . . it cannot lawfully fail to provide an equivalent amount of leave to new fathers for the same purpose."  *Id.*[4]

In this action, Mr. Rotondo asserts that as a result of Chase's practice of presumptively treating birth mothers as primary caregivers, birth fathers who wanted to serve as primary caregivers received 14 fewer weeks of paid parental leave than birth mothers under the 2016 Policy (and 11 fewer weeks of paid parental leave under the pre-2016 Policy), and that this differential in parental leave is unrelated to birth mothers' physical need to recover from childbirth.  *See* Compl. ¶ 3.  He asserts that this policy and practice constitutes a sex-based

---

[4] *See also* U.S. Equal Emp. Opportunity Comm'n, No. 915.002, Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities (2007), http://www.eeoc.gov/policy/docs/caregiving.html ("[E]mployers should carefully distinguish between pregnancy-related leave and other forms of leave, ensuring that any leave specifically provided to women alone *is limited to the period that women are incapacitated by pregnancy and childbirth*." (emphasis added)).

classification that treats male employees in a manner that "but for [their] sex" would be different, and rests upon impermissible sex-based stereotypes about men's role as breadwinners and women's role as caregivers, thus violating Title VII and parallel state antidiscrimination laws. *Id.* ¶¶ 53-55, 59-61.

## III. <u>SUMMARY OF THE SETTLEMENT TERMS</u>

The Settlement provides both programmatic relief and monetary relief to address Mr. Rotondo's concerns with Chase's parental leave policies and to compensate birth fathers who were adversely affected by those policies. The Settlement is summarized below.

### A. <u>The Settlement Class</u>

Under the Settlement, the Settlement Class is defined as follows:

> [A]ll male employees of Defendant nationwide who took the maximum amount of non-primary caregiver leave available under Defendant's policy in effect at the time of the birth of one or more child (either 1 week or 2 weeks depending on the time period) during the Settlement Class Period, or if applicable, the State Settlement Class Periods, and would have otherwise qualified for paid primary caregiver leave, but did not take primary caregiver leave.

Settlement § 1.38. The "Settlement Class Period" for Settlement Class Members who worked in any state outside of those included in separately-defined State Settlement Class Periods is from August 20, 2016 (300 days before the charge was filed) through December 4, 2017 (when Chase revised the 2016 policy). *See id.* § 1.39. For Settlement Class Members who worked for Chase in states that provide a longer period of time to bring an action than Title VII, longer State Settlement Class Periods ranging from one year to six years, as set forth in Section 1.41 of the Settlement and in the Proposed Order shall apply.[5]

---

[5] Those states are New York, Ohio, California, Washington, Alaska, Kentucky, Maine, New Jersey, North Carolina, South Dakota, Vermont, West Virginia, Arkansas, District of Columbia, Louisiana, Michigan, Minnesota, Oregon, and Tennessee. *See* Settlement § 1.41.

To be a Settlement Class Member, the person's child had to be born during the applicable Settlement Class Period or within 12 or 16 weeks before the Settlement Class Period.  *See id*. § 1.39.

### B.     Programmatic Relief

The Parties have agreed to meaningful programmatic relief that addresses the primary claim in this case: that Chase prevented and/or discouraged male employees from being primary caregivers and receiving paid parental leave on the same terms as birth mothers.  Under the Settlement, Chase will continue to maintain a gender-neutral parental leave policy, and will not reduce the amount of non-primary and primary caregiver leave it provides for four years from the effective date of the Settlement.  *Id.* § 3.5(A).  Chase also will conduct training of relevant human resources personnel and contractors on its new parental leave policy, monitor implementation of the policy, *id.* § 3.5(B), and provide data to Plaintiff's counsel on the policy implementation for two years after the Settlement's approval, *id.* § 3.5(C).

### C.     The Settlement Fund

The Settlement establishes a Gross Settlement Amount of $5,000,000 to settle the Settlement Class Members' claims against Chase.  *Id.* §§ 1.18, 3.1(A).  The Gross Settlement Amount covers all amounts to be paid to, or on behalf of, Settlement Class Members; any Court-approved Service Payment to the Named Plaintiff; any Attorneys' Fees and Litigation Expenses approved by the Court; and any Settlement Administrator's fees and costs that exceed $50,000.  *Id.* § 3.1(A).  The Net Settlement Fund (which is the Gross Settlement Fund minus attorneys' fees and costs, service payments, and the settlement administrator's fees and costs[6]) shall be

---

[6]  The Gross Settlement Amount will also cover the Employer's Share of Taxes, *see infra* Section 2.F, regarding payments to Settlement Class Members, the Named Plaintiff, and the Service Payment, up to 20% percent of the Net Settlement Amount.  Settlement § 3.1(A).  In

distributed in equal shares to Settlement Class Members based on the total number of valid claims each Settlement Class Member submits.  Settlement Class Members who had more than one child during the Settlement Class Period may file and receive compensation for multiple claims.  *Id.* § 3.4(B)(v).

         **D.**        **The Notice and Claims Process for Class Members to Receive Compensation**

The Settlement Administrator will mail the Court-approved Notice and Claim Form to Settlement Class Members within 15 days of the issuance of the Preliminary Approval Order. *Id.* § 2.5(C).  The Settlement Administrator will take all reasonable steps to obtain the correct address of any Settlement Class Member for whom the Notice is returned as undeliverable and will attempt re-mailings if better address information is obtained.  *Id.* § 2.5(D).

To receive a Settlement Award, Settlement Class Members must submit a valid Claim Form by the Claim Form Deadline (60 days after the initial mailing, or 45 days after any later re-mailing of the Notice and Claim Form).  *Id.* §§ 1.6, 2.6(A).  Thirty days after the initial mailing, the Settlement Administrator will send a reminder postcard to Settlement Class Members who have not returned a valid Claim Form.  *Id.* § 2.5(E); *see* Ex. E to Settlement ("Reminder Postcard").  If any Claim Form is timely submitted but incomplete, the Settlement Administrator will send a Cure Letter requesting any information not provided and advising of the applicable deadline to return a properly completed Claim Form.  *Id.* § 2.6(C).  Settlement Class Members who wish to object to the proposed Settlement must mail a written objection to the Settlement Administrator by 60 days from the mailing of the Notice.  *Id.* § 2.8(A).

---

addition to the Gross Settlement Amount, Chase will pay the Settlement Administrator's fees and costs up to $50,000 and the employer's share of payroll taxes beyond any amount of payroll taxes paid from the Net Settlement Amount under the allocation plan.  *Id.*; *see infra* Section 2.F.

E.    <u>Releases</u>

Settlement Class Members who do not opt out will release claims under federal and state law against Chase and its related entities that were made or could have been made to challenge Chase's parental leave policy or application of it as sex discrimination during or before the Settlement Class Period or relevant State Settlement Class Period.  *Id*. §§ 4.1(A), (B), 4.2.  In the Claim Form, each Settlement Class Member will execute a release of such claims.  *Id.* § 4.1(B).

F.    <u>Payments to Settlement Class Members from the Net Settlement Fund</u>

Settlement Class Members will receive payments from the Net Settlement Amount.  *Id.* § 3.4(A).  The Net Settlement Amount is the Gross Settlement Amount minus:  (1) Court-approved Attorneys' Fees and Litigation Expenses; (2) Court-approved Service Payment to the Named Plaintiff; and (3) costs for notice and settlement administration that exceeds $50,000.00. *Id*. § 1.22.

The Net Settlement Amount will be distributed as follows.  First, the Settlement Administrator will determine the total number of valid claims filed by the Settlement Class Members.  *Id*. § 3.4(B)(i).  Settlement Class Members who file more than one valid claim shall be entitled to receive an additional share of the Net Settlement Amount for each valid claim.  *Id*. Second, the Settlement Administrator will divide the Net Settlement Amount by the total number of valid claims for all Settlement Class Members to determine the pro rata share of the Net Settlement Amount ("Pro Rata Share").  *Id*. § 3.4(B)(ii).  Third, from the Net Settlement Amount the Settlement Administrator will distribute to each Settlement Class Member the Pro Rata Share times the number of valid claims he filed, less the Employer's Share of Taxes and any employees' share of payroll taxes withheld by the Settlement Administrator, *see id*. §§ 3.4(B)(v),

11

3.6(A).[7]  For tax purposes, half of the amount paid to Settlement Class Members shall be treated as wages, and half shall be treated as non-wage income.  *Id.* § 3.6(A). Settlement Class Members will have 180 days to cash the checks that they receive.  *Id.*[8]

### G.    Attorneys' Fees, Litigation Expenses, and Service Payment

The Settlement provides that Class Counsel will receive a portion of the Gross Settlement Amount as their attorneys' fees and costs, subject to court approval.  *See id.* § 3.2(A).  Class Counsel may request attorneys' fees not to exceed one-third of the Gross Settlement Amount, as well as reimbursement of reasonable costs and expenses.  *Id.*  Under Rule 23(h), Class Counsel will file a motion for approval of attorneys' fees and costs with their Final Approval Motion. Mr. Rotondo will also request at the time of the Final Approval Motion a Service Payment in recognition of his service to the Settlement Class.  *See id.* § 3.3(A).

### H.    Settlement Claims Administrator

The Parties recommend that the Court appoint RG/2 Claims Administration LLC as the Settlement Administrator.  *Id.* § 1.36; *see* Declaration of William W. Wickersham.  Chase will pay the Settlement Administrator's fees and costs up to $50,000 in addition to the Gross

---

[7] The Settlement Administrator will calculate the total employer share of payroll taxes associated with the Pro Rata Shares allocable to Settlement Class Members who submit valid claim forms (the "Employer's Share of Taxes").  Settlement § 3.4(B)(ii).  If the Employer's Share of Taxes is less than twenty percent of the Net Settlement Amount, the Settlement Administrator shall subtract the Employer's Share of Taxes from the Net Settlement Amount.  *Id.* § 3.4(B)(iii).  If the Employer's Share of Taxes is more than twenty percent of the Net Settlement Amount, twenty percent shall be subtracted from the Net Settlement Amount and Defendant shall then provide additional funds separate from and in addition to the Gross Settlement Amount.  *Id.* § 3.4(B)(iv).

[8] Any amount remaining 20 days after the expiration of the 180-day Acceptance Period will be redistributed to Settlement Class Members who have timely cashed their checks or, if the amount remaining is small enough that a redistribution is not sensible, unclaimed funds will be donated to a non-profit group approved by the Court under the *cy pres* doctrine.  *Id.* §§ 1.4, 3.1(F).

12

Settlement Amount. *Id.* § 3.1(A). The fees and costs of the Settlement Administrator above $50,000 will be paid from the Gross Settlement Amount. *Id.*

## IV.     CLASS ACTION SETTLEMENT PROCEDURE

The well-established procedure for approving class action settlements involves three steps: (1) preliminary approval of the proposed settlement after submission to the court of a written motion; (2) notice of the settlement to all class members; and (3) a final settlement approval hearing where the court will consider whether the settlement is fair, adequate, and reasonable such that it should be approved. Fed. R. Civ. P. 23(e); *see also* 4 William B. Rubenstein, Newberg on Class Actions § 13:1 (5th ed. 2018). Here, Plaintiff requests that the Court take the first step by granting preliminary approval, certifying a Settlement Class, and approving the proposed Notice.

Plaintiff respectfully requests the Court approve the schedule for the settlement approval process set forth in the Proposed Order Granting Plaintiff's Motion for Preliminary Approval.

## V.     PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

"[S]ettlement of class actions is generally favored and encouraged." *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 371 (S.D. Ohio 2006); *see Robinson v. Shelby Cty. Bd. of Educ.*, 566 F.3d 642, 648 (6th Cir. 2009) ("[P]ublic policy strongly favors settlement of disputes without litigation." (citation omitted)); *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) ("*General Motors*") ("[F]ederal policy favor[s] settlement of class actions . . . ."). Courts encourage early class settlements, which allow class members to recover without undue delay and preserve judicial resources. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) ("By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn

13

before over-burdened courts, and to the citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute.").

A preliminary approval inquiry "is not an onerous one" and is ordinarily "made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties." *Stanley v. Turner Oil & Gas Props., Inc.*, No. 16 Civ. 386, 2018 WL 2268138, at *1 (S.D. Ohio Mar. 6, 2018); *see In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 337 (N.D. Ohio 2001) ("*In re Inter-Op Litig.*") ("[T]his threshold inquiry often involves no more than an informal presentation."). Where a settlement is not collusive or illegal, but "appears to fall within the range of possible approval," a court should grant preliminarily approval. *In re Inter-Op Litig.*, 204 F.R.D. at 350 (quoting Manual for Complex Litigation (Third) § 30.41 (1995)); *see In re S. Ohio Corr. Facility*, 173 F.R.D. 205, 211 (S.D. Ohio 1997).

Courts balance numerous factors to preliminarily assess the fairness of a proposed settlement, including:

> (1) the strength of plaintiffs' case, both as to liability and damages; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the reaction of the class members to the proposed settlement; (8) the public interest; and (9) the ability of the defendants to withstand a greater judgment.

*In re Inter-Op Litig.,* 204 F.R.D. at 351. As explained below, because these factors strongly weigh in favor of preliminary approval in this case, the Court should grant preliminary approval of the Settlement and "direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing." *In re Inter-Op Litig.*, 204 F.R.D. at 350.

## A. <u>Plaintiff Has a Strong Case, as to Both Liability and Damages.</u>

Mr. Rotondo's discrimination claims under Title VII and parallel state law provisions are strong. Similar to the cases described in Section I.E, Chase's previous practice of treating birth

mothers as presumptive primary caregivers constitutes sex discrimination.  Chase's policy is, on its face, a "parental leave" policy—not a pregnancy-related disability policy; it is unrelated to the period of time necessary for recovery from childbirth, and applies to birth and adoptive parents alike.[9]  Moreover the "primary" and "non-primary" caregiver distinction is defined based upon the employee's role relative to their spouse or partner in *caregiving*.  Chase's caregiver leave policy should therefore have been made available on a gender-neutral basis in every way.  *See Guerra*, 479 U.S. at 290; *Hibbs*, 538 U.S. at 730; *Schafer*, 903 F.2d at 248.

Yet unlike female employees, who were presumptively treated as primary caregivers, male employees under Chase's prior policy were required to make the additional showing that their spouse was either incapacitated or had returned to work prior to being deemed eligible for primary caregiver status.[10]  By imposing different standards on male and female employees to be deemed primary caregivers, Chase treated men in a manner that, but for their sex, would have been different, in violation of Title VII's prohibition on intentional sex discrimination.  *See Oncale*, 523 U.S. at 80.

Moreover, the presumption Chase imposed on Mr. Rotondo and its employees rested upon and perpetuated stereotypes about men's role as breadwinners and women's role as

---

[9] Chase's policy is thus unlike policies that have been upheld as sufficiently related to the period of pregnancy disability.  *See, e.g.*, *Kucharski v. CORT Furniture Rental*, 342 F. App'x 712, 713 (2d Cir. 2009) (employer's policy providing four weeks of leave was "applie[d] uniformly regardless of sex or medical condition."); *Johnson v. Univ. of Iowa*, 431 F.3d 325, 329 (8th Cir. 2005) (upholding policy that provided 6 weeks of paid leave for biological mothers and none to fathers in light of the policy's purpose of providing time to recover from childbirth).

[10] In addition, both the 2016 and the pre-2016 Policies incorporated this presumption more explicitly in providing that an employee could switch from non-primary to primary caregiver status if the child's "mother has returned to work or is medically incapable of [providing] any care" for the child.  Of course, the term *mother* is an explicitly gendered term.

caregivers that the Supreme Court and other courts have repeatedly rejected. *See Hibbs*, 538 U.S. at 736; *Knussman*, 272 F.3d at 637; *supra* Section I.E. The application of the policy could be expected to result in "a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees." *Hibbs*, 538 US at 736. Mr. Rotondo and the thousands of birth fathers otherwise eligible to take primary caregiver parental leave therefore have a strong case for liability under Title VII and parallel state laws, and for the full scope of legal and equitable remedies available under those statutes.[11]

### B. Plaintiff and Class Members Would Face Real Risks in Further Litigation.

Despite the strength of Mr. Rotondo's class claims on the merits, he fully recognizes that he would face significant legal and procedural hurdles in establishing classwide liability and damages. As a general matter, "complex litigation is 'notoriously difficult and unpredictable.'" *Vassalle v. Midland Funding, LLC*, No. 11 Civ. 96, 2014 WL 5162380, at *6 (N.D. Ohio Oct. 14, 2014) (quoting *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). Mr. Rotondo recognizes the substantial risks of the litigation, including the possibility that the case, if not settled now, might result in no recovery or a recovery far less favorable to the Class. He is also aware that if the action continued, any recovery may not occur for several years.

Mr. Rotondo's case would face challenges from Chase on both liability and damages, which would present significant risks and could require substantial factual development about Chase's policies and how Plaintiff and the Class Members were affected. Chase would likely

---

[11] Furthermore, even if Mr. Rotondo failed in showing that Chase's policy relied on a sex-based classification or sex-based stereotyping, he would easily prove that Chase's policy had a disparate impact on male employees who had children. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009).

16

argue its policies were not facially discriminatory (as Plaintiff contends), that to prevail Mr. Rotondo would have to prove that Chase applied its policies in a biased way, and that Chase applied its policies in a gender-neutral manner. Chase would likely assert that Mr. Rotondo could have qualified for primary caregiver leave under the policy's express terms, that far more fathers requested and were granted primary caregiver leave than were denied, and that the circumstances by which each father requested and was denied primary caregiver leave requires individual inquiry that may bar class certification. Even if Mr. Rotondo should prevail on the issue of liability on one or more theory, Chase would likely contest any damage award to fathers denied leave, arguing that because they received pay for the time period worked, they suffered no loss in pay. Mr. Rotondo and his counsel, who are experienced class action employment lawyers, understand the resolution of these liability issues, the outcome of a trial, and a likely appeal are inherently uncertain in the outcome and duration.

Furthermore, since Chase requires its employees to sign an arbitration clause with a class waiver, there is a substantial chance this case could not be pursued as a class action, resulting in no relief for the thousands of Settlement Class Members who will benefit from the Settlement.[12]

In contrast to these and other risks, the Settlement's programmatic and monetary relief remedy the unfairness at the heart of the case, ensuring that Chase continues to maintain a gender-neutral parental leave policy and implement it fairly, and compensating employees allegedly harmed by Chase's prior policies. In light of the strengths and weaknesses here, the

---

[12] Defendant has waived this defense solely for purposes of obtaining the proposed Class Settlement, which saves years of costly litigation over the enforceability of the arbitration agreement, and obviates the need for individualized arbitration of each class member's claims.

Settlement achieves excellent benefits for Settlement Class Members.  This factor therefore weighs in favor of preliminary approval.

### C.    Further Litigation Would Be Lengthy, Complex, and Costly.

By reaching a favorable settlement prior to dispositive motions, class certification, or trial, Plaintiff seeks to avoid significant expense, risk, and delay, and instead ensure a recovery for the Settlement Class Members.  Courts recognize that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them."  *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)); *see also Schaefer v. Tannian*, No. 73 Civ. 39943, 1995 WL 871134, at *8 (E.D. Mich. Apr. 17, 1995) ("The track record for large class action employment discrimination cases demonstrates that many years may be consumed by trials and appeals before the dust finally settles.").  This case is no exception, with approximately 5,000 Settlement Class Members pleading relatively novel sex discrimination claims under federal and state law.   *See* Romer-Friedman Decl. ¶ 41.

Further litigation would cause additional expense and delay.  Plaintiff would need to defeat a motion to compel arbitration and a motion to dismiss.  Extensive fact and expert discovery would be needed to establish liability, damages and class certification.  The Parties would likely cross-move for summary judgment, requiring extensive briefing and delaying the resolution of the merits.  If the Court finds that factual disputes bar summary judgment, a lengthy trial would occur.  Any judgment would likely be appealed, further extending the litigation.  This Settlement, on the other hand, provides significant relief to Settlement Class Members in a prompt and efficient manner.  Therefore, this factor weighs in favor of preliminary approval.

**D.** **Maintaining the Class Through Trial Would Not Be Simple.**

Obtaining class certification and maintaining it through trial would present a real risk.
The Court has not certified a class, and certification of Title VII sex discrimination action can be
difficult, even in more "typical" sex bias cases. *E.g.*, *Davis v. Cintas Corp.*, 717 F.3d 476, 487-
89 (6th Cir. 2013) (affirming denial of certification in a sex bias case for lack of commonality);
*cf. Chen–Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 66-67, 84 (S.D.N.Y. 2018) (granting in
part and denying in part certification in a sex discrimination case over 7 years after the complaint
was filed, nearly 4 years after the certification motion, and multiple interlocutory appeals).
Settlement eliminates the risk, expense, and delay that permeate that process.

**E.** **The $5 Million Settlement Fund Is Substantial.**

The Parties have agreed to settle this case for $5,000,000, a substantial amount and the
largest known class settlement of claims challenging sex discrimination in parental leave.
Romer-Friedman Decl. ¶ 37. The settlement amount represents excellent value given the risks of
litigation, though the recovery could potentially be greater if Plaintiff won class certification,
succeeded on all claims at trial, proved the Class's damages, and survived an appeal. *Id.* Each
Settlement Class Member will receive a pro rata share of the Net Settlement Fund based on the
number of valid claims submitted. Settlement § 3.4(B)(i)-(v). And Class Counsel believe that it
is likely that each claim could be worth thousands of dollars. Romer-Friedman Decl. ¶ 38. For
example, if 500 valid claims are filed, at a minimum each claim would receive a payment of
approximately $6,500.00 (less applicable taxes) from the Settlement Fund. *Id.*

Moreover, the Settlement includes important programmatic relief—having and
implementing a gender-neutral policy, and related training and monitoring—that curbs "the
practices which were alleged to give rise to violations of Title VII"; "[t]his relief enhances
the settlement by guaranteeing that all class members who continue to work at [Chase] will

19

benefit from the settlement." *Sweet v. Gen. Tire & Rubber Co.*, No. 75 Civ. 181A, 1982 WL 278, at *6 (N.D. Ohio Mar. 17, 1982); *see* Settlement § 3.5. Thousands of Chase employees and their families, including members of the Settlement Class, will benefit from this prospective relief in the future. Romer-Friedman Decl. ¶ 39.

Weighing the substantial benefits of the Settlement against the available evidence and the risks associated with proceeding in the litigation, the settlement amount is reasonable.

### F.     Discovery Advanced Enough for the Parties to Resolve the Case Responsibly.

During the course of the negotiation, the Parties exchanged sufficient information to resolve this case in a manner that is fair and responsible. In evaluating this factor, courts must consider whether "the parties and the court have adequate information in order to evaluate [their] relative positions," and "should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced." *Wright v. Premier Courier, Inc.*, No. 16 Civ. 420, 2018 WL 3966253, at *4 (S.D. Ohio Aug. 17, 2018) (internal quotation marks and citations omitted); *accord Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 557 (S.D. Ohio 2000).

Here, the Parties undertook a range of relevant discovery that led to an informed negotiation and settlement. Plaintiff's Counsel interviewed Mr. Rotondo and a number of other current and former Chase employees to investigate how their parental leave requests were treated, their interactions with Chase's human resources, and other facts. Romer-Friedman Decl. ¶ 31. Before mediation, Chase provided Plaintiff's Counsel with a range of information on its parental leave policies and how they were applied, the number of fathers who took primary and non-primary caregiver leave, and salary information of Chase employees. *Id.* ¶ 32. Before and during the EEOC proceedings, Plaintiff's Counsel conducted a thorough investigation into and legal research on the merits of the potential claims and defenses, class certification, and the

potential relief, and the Parties exchanged detailed EEOC position and mediation statements to inform each other of the key facts and legal issues. *Id.* ¶ 33.

All of this discovery and information informed the two negotiating sessions (without a mediator), the two full days of mediation, and dozens of calls and other communications that led to an informed Settlement. *Id.* ¶ 34. These circumstances show "both parties have been afforded an adequate opportunity to conduct sufficient discovery to be fully appraised of the legal and factual issues presented as well as the strengths and weaknesses of their cases," which supports preliminary settlement approval. *Wright*, 2018 WL 3966253, at *4 (discovery factor supported approval where investigation included conferences with class members, consideration of documents, and analysis of the viability of class treatment and potential class-wide damages).

### G.  Experienced Counsel Recommend Approval.

The recommendation in this case by experienced and highly-regarded counsel for both Parties should guide the Court to grant preliminary approval.  "The recommendation of [c]lass [c]ounsel . . . that the Court should approve the Settlement is entitled to deference," *id.* at *5, and here a group of experienced civil rights lawyers recommend this Settlement as an excellent resolution for the proposed Class.  Plaintiff's Counsel—including attorneys from the ACLU Women's Rights Project, a national leader in challenging policies that perpetuate sex discrimination and stereotypes—have extensive experience litigating complex employment class actions.  *See* Romer-Friedman Decl. ¶¶ 5-9, 22-23; Decl. of Galen Sherwin ("Sherwin Decl.") ¶¶ 3, 5, 7.  In this case, counsel engaged in sufficient discovery and negotiations to make a well-informed settlement decision.  Romer-Friedman Decl. ¶¶ 30-35; *Levell*, 191 F.R.D. at 557 (deferring to counsel where parties engaged in "informal discovery and extensive negotiations").  Counsel negotiated at arm's length with the aid of an experienced mediator.  Romer-Friedman Decl. ¶ 36; *see* Settlement § 5.1; *Bert v. AK Steel Corp.*, No. 02 Civ. 467, 2008 WL 4693747, at

21

*2 (S.D. Ohio Oct. 23, 2008) ("[P]articipation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion . . . .").

### H.    The Reaction of the Class Has Been Positive.

After Notice issues and Settlement Class Members have had an opportunity to be heard, the Court can more fully analyze this factor.  The Named Plaintiff fully supports the Settlement. Romer-Friedman Decl. ¶ 40.  Moreover, the programmatic changes already agreed to by Chase, which have included maintenance of a revised paid parental leave policy and a commitment to train of all relevant Human Resources and related personnel, should fully resolve the problematic aspects of Chase's policy and how it was implemented.  The award in this case would likely be considered substantial:  As stated in the Proposed Notice (Settlement Ex. D), counsel have estimated that a likely amount would range between approximately $5,862 per claim (if class members file 10% of the potentially valid claims) and $837 (if class members file 70% of the potentially valid claims), less the employee share of any applicable taxes, although it may be more or less depending on the number of Settlement Class Members who submit valid Claim Forms.  Romer-Friedman Decl. ¶ 38.  Even if the per-employee amount is on the low end of that range, the amount will likely be deemed satisfactory in light of the uncertainty involved in receiving an award should the litigation proceed.  Moreover, many fathers who were deterred from seeking primary caregiver leave may not be aware that their rights were potentially violated at all.  Based on Plaintiff's Counsel's communications with Mr. Rotondo and other Settlement Class Members, Plaintiff's Counsel are confident the proposed Settlement directly addresses their concerns with Chase's policies and that the Class will respond favorably.  *Id.* ¶ 40.

I.      **Approval Is in the Public Interest.**

The public interest supports approval.  *See Robinson*, 566 F.3d at 648 ("[I]t is . . . well-established that '[p]ublic policy strongly favors settlement of disputes without litigation.'" (quoting *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 469 (6th Cir. 2007))).  In addition to fairly compensating Settlement Class Members, the programmatic relief ensures that hundreds of thousands of Chase employees can continue to take gender-neutral parental leave if they desire to do so.  These benefits help all employees and mitigate longstanding gender stereotypes that the Supreme Court and Congress have condemned.  *See Hibbs*, 538 U.S. at 729-35.  The Settlement also conserves judicial resources by preventing what would surely be a lengthy and protracted litigation.  *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (noting "conservation of judicial resources" is a benefit of settlements).

J.      **Defendant's Ability to Withstand a Judgment Is Neutral.**

Chase's ability to withstand a judgment should not be a determining factor in this case.  Although Chase could, as a financial matter, likely pay a greater judgment, its ability to do so, "standing alone, does not suggest that the settlement is unfair."  *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 178 n.9 (S.D.N.Y. 2000).  This factor is more than outweighed by the benefits discussed above.  Thus, this factor is neutral and largely irrelevant.

\*      \*      \*

As the relevant factors show that the settlement is "fair, reasonable, and adequate," and is not a "product of fraud or collusion," preliminary approval should be granted.  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986).

VI.     **PROVISIONAL CERTIFICATION OF A CLASS IS APPROPRIATE.**

Plaintiff requests that the Court conditionally certify a Settlement Class under Rule 23 and appoint Class Counsel to effectuate the Settlement, as courts ordinarily do when granting

preliminary approval. *See, e.g.*, *Schell v. Frederick J. Hanna & Assocs., P.C.*, No. 15 Civ. 418, 2016 WL 1273297, at *1 (S.D. Ohio Mar. 31, 2016) (certifying a class for settlement purposes and appointing class counsel); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 790-92 (3d Cir. 1995) (noting the purposes of provisional class certification).

Under Rule 23(a), a class action may be maintained if all four requirements of Rule 23(a) are met, as well as one of the prongs of Rule 23(b). Fed. R. Civ. P. 23(a)-(b). Here, the proposed Settlement Class meets all of the class certification requirements, and Chase consents to the certification motion for settlement purposes, *see* Settlement § 2.4(A); *see General Motors*, 497 F.3d at 622-23, 626 (affirming the district court's decision to certify settlement-only classes).

### A. <u>Numerosity</u>

The proposed Settlement Class easily satisfies numerosity. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is presumed when there are more than 40 class members. *Phillips v. Philip Morris Cos. Inc.*, 298 F.R.D. 355, 362 (N.D. Ohio 2014). "[Th]e numerosity requirement is satisfied where the exact size of the class is not known, but general knowledge and common sense indicate that the class is large." *Id.* Here, there are about 5,000 persons who may qualify as Settlement Class Members, as they are fathers who were eligible to seek primary caregiver leave. Romer-Friedman Decl. ¶ 41; *see Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (numerosity met where "proposed class include[d] thousands of individuals"). Even classes a fraction of this size satisfy numerosity, as the "judicial and litigation resources required" make joinder "impracticable." *Smith v. Ajax Magnethermic Corp.*, No. 02 Civ. 0980, 2007 WL 3355080, at *2 (N.D. Ohio Nov. 7, 2007) (certifying class of 55). The numerosity requirement therefore is not subject to question in this case.

B.    **Commonality**

The proposed class also satisfies the commonality requirement, which requires that there

be at least one common factual or legal question.  Fed. R. Civ. P. 23(a)(3).  Commonality is met

where the class members' claims "'depend upon a common contention . . . that it is capable of

classwide resolution.'"  *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722

F.3d 838, 852 (6th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011)).  As the Supreme Court explained, commonality is clearly satisfied where, as here,

employees challenge a specific, centralized employment policy and a plaintiff seeks to represent

all employees who were allegedly prejudiced by that policy.  *Dukes*, 564 U.S. at 353; *see, e.g.*,

*Myers v. Marietta Mem'l Hosp.*, No. 15 Civ. 2956, 2018 WL 4932087, at *1, *6 (S.D. Ohio Sept.

10, 2018) (commonality met where nurses alleged all class members were injured by the

employer's automatic meal deduction policy); *Potter v. Blue Cross Blue Shield of Mich.*, No. 10

Civ. 14981, 2013 WL 12182603, at *4 (E.D. Mich. Mar. 4, 2013) (commonality met where class

members were all denied insurance coverage "solely by reference to its medical policy

statement").

Here, all the central factual and legal issues are common to all Settlement Class Members

and capable of a class-wide resolution.  All Settlement Class Members claim that they were

denied primary caregiver leave under the same nationwide policies, which treated birth mothers

as presumptive primary caregivers entitled to 12 or 16 weeks of primary caregiver leave, while

subjecting fathers to additional conditions in order to qualify.  This policy was therefore a sex-

based classification and premised on impermissible gender stereotyping.  All Settlement Class

Members also suffered the same type of injury of being denied or deterred from seeking paid

primary caregiver leave.  The common legal issues in the case require no individualized inquiry.

25

### C.   **Typicality**

Mr. Rotondo's claims are also typical of those of the Settlement Class Members. Although Rule 23(a)(3) requires the named plaintiff's claims to be typical of the class members' claims, typicality does not require the claims to be factually identical.  *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976); *McDonald v. Franklin Cty.*, 306 F.R.D. 548, 557 (S.D. Ohio 2015).  Typicality is satisfied where the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Newberg on Class Actions § 3:13 (3d ed. 1992)).  Typicality is easily satisfied here.  Mr. Rotondo's claims arise from the same factual and legal circumstances that form the basis of the Settlement Class Members' claims.  Chase applied the same parental leave policies to Mr. Rotondo and the Settlement Class Members.  Their claims all rely on the same legal theory that Chase's parental leave policies constitute sex discrimination, and they all suffered the same injury of being denied a greater amount of paid parental leave.

### D.   **Adequacy of the Named Plaintiff**

Mr. Rotondo is also an adequate class representative, with qualified counsel.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this standard:  "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Inter-Op. Litig.*, 204 F.R.D. at 342 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083). "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."  *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083.  Here, Mr. Rotondo does not

have interests that conflict with the Settlement Class Members' interests for the same reasons he satisfies typicality.  And he has selected counsel who have zealously and competently represented the Class's interests and have extensive experience litigating complex employment and civil rights class actions, including sex discrimination cases.  *See* Romer-Friedman Decl. ¶¶ 6-9, 22-23 (describing the work and experience of Outten & Golden LLP); Sherwin Decl. ¶¶ 3, 5 (describing the work and experience of the ACLU Women's Rights Project); *see also infra* Section VI.  The adequacy requirement is therefore satisfied.

### E.    Certification Is Proper under Rule 23(b)(3).

The Court should certify the proposed Settlement Class under Rule 23(b)(3), because "[1] questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.    Common Questions Predominate.

Common questions predominate in this case.  "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  When determining whether common issues "predominate" over "questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting 2 William Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012)).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be

27

considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses . . . ."  *Id.* (citation and internal quotations omitted); *accord Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) ("*Tyson* instructs that certification may remain 'proper' even if 'important matters' such as actual injury, causation, and damages will have to be tried separately." (citing *Tyson*, 136 S. Ct. at 1045)); *Pund v. City of Bedford, Ohio*, 339 F. Supp. 3d 701, 722 (N.D. Ohio 2018) (certifying Rule 23(b)(3) class despite "significant factual differences in each class member's case").

Here, the central factual and legal questions – whether Chase's nationwide parental leave policy constituted an unlawful sex-based classification and stereotyping by presumptively treating birth mothers as primary caregivers – are common and can be proven with common evidence and legal arguments.  Thus, these common issues predominate over any possible individual variations that may exist within the Class, for example, with respect to damages.

## 2.    A Class Action Is Superior to Individual Actions.

Rule 23(b)(3) also requires that "a class action is the superior method for fair and efficient adjudication."  *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630 (6th Cir. 2011).  Rule 23(b)(3) sets forth a non-exclusive list of factors relevant to superiority, including the class members' interests in individually controlling separate actions; whether individual class members wish to bring, or have already brought, individual actions; the desirability of concentrating the claims in the particular forum; and manageability of a class action. Fed. R. Civ. P. 23(b)(3).  The Supreme Court, however, has held that manageability need not be considered in certifying a class for settlement purposes.  *Amchem Prods.*, 521 U.S. at 620.

The class action device is superior in this case as "the cost of [individual] litigation would dwarf any potential recovery," and Plaintiff is not aware of any individual suits alleging the same

violations.  *In re Whirlpool Litig.*, 722 F.3d at 861.  Resolving the same claims of thousands of

Chase employees in the same class action will also achieve economies of scale, conserve judicial

resources, and avoid the waste and delay of repetitive proceedings and inconsistent adjudications

of similar issues and claims.  *See In re Inter-Op Litig.*, 204 F.R.D. at 348.

## VII.    PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL.

Rule 23(g) governs the appointment of class counsel and sets forth four criteria to

evaluate the adequacy of counsel: (1) "the work counsel has done in identifying or investigating

potential claims in the action;" (2) "counsel's experience in handling class actions, other

complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of

the applicable law"; and (4) "the resources that counsel will commit to representing the class."

Fed. R. Civ. P. 23(g)(1)(A).  Plaintiff's Counsel meet these criteria.  They have done substantial

work identifying, investigating, prosecuting, and settling the class claims here.  Romer-Friedman

Decl. ¶¶ 30-35.  They have substantial experience prosecuting and settling employment class and

individual actions, including novel and complex sex discrimination cases.  Romer-Friedman

Decl. ¶¶ 5-9, 22-23; Sherwin Decl. ¶¶ 3, 5, 7.  Thus, courts have repeatedly appointed Plaintiff's

Counsel to be class counsel in employment and civil rights class actions.  *See, e.g.*, Romer-

Friedman Decl. ¶¶ 6, 8 (listing cases); Sherwin Decl. ¶ 5 (same).

## VIII.    THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE APPROPRIATE.

The Court should approve the Proposed Notice (Settlement Ex. D).  Rule 23 requires the

notice process to be "the best notice that is practicable under the circumstances, including notice

to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

The Proposed Notice satisfies due process and Rule 23, as it describes clearly and in detail the

nature of the action, the class definition and claims, the Settlement's relief, how class members

can file claim forms to receive payments, how attorneys' fees will be awarded, that a class

member may appear and object to the settlement or request to be excluded, how and when to object or opt out, and that the judgment will bind class members who do not opt out.  *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1).  Under the Settlement, within 20 days of Preliminary Approval, the Settlement Administrator will mail the Notice and Claim Form to the last known address of each Settlement Class Member, take further steps to locate Settlement Class Members whose notices are returned as undeliverable, and send reminder postcards 30 days after the initial mailing of the Notice.  Settlement § 2.5(C)-(E).  The process for submitting Claim Forms is also reasonable, as it gives Settlement Class Members 60 days from the Notice to complete and submit a brief Claim Form, Settlement Class Members who submit Claim Forms with insufficient information will receive Cure Letters so that they can submit complete information, and Class Members who submit valid timely Claim Forms will receive payments within 30 days of the Effective Date.  *Id.* §§ 2.6(A)-(C), 3.1(C).  Moreover, should the claims rate be low, the Settlement permits the Parties to meet to discuss whether additional efforts should be undertaken to notify Class Members, and to petition the settlement administrator or the Court, if needed, for approval of such additional measures.  *Id.* § 2.5(F).

## IX.    <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court grant this Motion and enter the Proposed Order.

Dated: May 30, 2019

Respectfully submitted,

/s/ Freda Levenson
Freda Levenson (0045916)
*Trial Attorney*
**AMERICAN CIVIL LIBERTIES UNION
OF OHIO FOUNDATION**
4506 Chester Avenue
Cleveland, OH 44103
Telephone: (614) 586-1958
flevenson@acluohio.org

Peter Romer-Friedman (*pro hac vice*
forthcoming)
Pooja Shethji (*pro hac vice* forthcoming)*
**OUTTEN & GOLDEN LLP**
601 Massachusetts Ave NW
Suite 200W
Washington, DC 20001
Telephone: (202) 770-7886
prf@outtengolden.com
pshethji@outtengolden.com

Deirdre Aaron (*pro hac vice* forthcoming)
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
daaron@outtengolden.com

Galen Sherwin (*pro hac vice* forthcoming)
**AMERICAN CIVIL LIBERTIES UNION
WOMEN'S RIGHTS PROJECT**
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2644
gsherwin@aclu.org

* Admitted in New York; not yet a member of
the D.C. Bar; supervised by a member of the
D.C. Bar.

***Attorneys for Plaintiff and the Putative Class***

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing Plaintiff's Unopposed Motion for Preliminary

Approval of Class Action Settlement, Conditional Certification of the Settlement Class,

Appointment of Plaintiff's Counsel as Class Counsel, and Approval of the Proposed Notice of

Settlement and Class Action Settlement Procedure, and Memorandum in Support on the

following via regular U.S. Mail and email on this 30th date of May 2019:

> Thomas J. Perelli
> Emily Loeb
> JENNER & BLOCK LLP
> 1099 New York Avenue, N.W.
> Suite 900
> Washington, DC 20001-4412
> TPerrelli@jenner.com
> ELoeb@jenner.com

> /s/ Freda Levenson
> Freda Levenson (0045916)
> *Trial Attorney*